# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| ROTATING SOLUTIONS, INC., | § | CIVIL ACTION NO._____ |
|     PLAINTIFF | § | |
| | § | |
| V. | § | JUDGE _____ |
| | § | |
| TAV HOLDINGS, INC. AND | § | |
| THOMAS VALERIO, | § | |
|     DEFENDANTS. | § | MAG. JUDGE _____ |

### ORIGINAL COMPLAINT AND REQUEST FOR SUMMARY PROCEEDING TO OBTAIN SURRENDER OF LEASED PROPERTY

Rotating Solutions ("RSI") leased industrial equipment to TAV Holdings, maintained and helped operate that leased equipment, and repaired other TAV equipment. TAV, though, has stopped paying RSI for the leased equipment and for RSI's work. RSI now sues to recover the amount owed: $972,379.

RSI also seeks an expedited court order compelling the return of its leased property under the Louisiana Lease of Movables Act, La. R.S. §§ 9:3301, 9:3322.

### PARTIES & SERVICE

1.  RSI is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Rayne, Acadia Parish, Louisiana. Pursuant to 28 U.S.C. § 1332(c), RSI is a citizen of Louisiana and Delaware.

2.  TAV is a corporation organized and existing under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia. TAV is registered to do business in the State of Louisiana and may be served through its Registered Agent, CT Corporation Systems, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816. Pursuant to 28 U.S.C. § 1332(c), TAV is a citizen of Georgia.

3.     Thomas Valerio is an individual domiciled in Atlanta, Georgia, and the Chief Executive Officer of TAV. He may be served at 111 Hollow Tree Lane SW, Atlanta, Georgia, 30354. Mr. Valerio is a citizen of Georgia.

### JURISDICTION & VENUE

4.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between a plaintiff and defendants of different states.

5.     The Court has specific personal jurisdiction over this matter because Defendants purposely directed their activities to Louisiana, the Plaintiff's claims arise out of and result from Defendants' contacts in Louisiana, and the exercise of personal jurisdiction is fair and reasonable. Specifically, Defendant TAV entered into contracts with RSI, a Louisiana-based company, sent TAV equipment to Louisiana for repair, leased equipment from RSI that was shipped from Louisiana to TAV locations, and regularly sent emails to and called RSI employees about ongoing services and repairs to the TAV equipment and leased RSI equipment. Defendant Valerio communicated misrepresentations to RSI employees in Louisiana via email and phone calls, traveled to Louisiana to meet with RSI employees, and engaged in tortious conduct outside of Louisiana with knowledge and intent that its effect would be felt in Louisiana.

6.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### FACTUAL BACKGROUND

**The Parties.**

7.     RSI is headquartered in Rayne, Louisiana. It manufactures industrial equipment used in the energy, environmental, and metals industries. Perhaps most notably, RSI manufactures large centrifuges used to extract valuable minerals from wastewater generated in industrial processes. Below

is a photo of a standard 3-phase centrifuge, with the associated scaffolding (termed a "skid").



8.      TAV claims to be a "leading firm in separation technology for different industries." It offers customers "separation technology" for residue from shredded metals, electronic equipment, and ash. TAV uses RSI's centrifuges, and other equipment, to separate components of industrial residue into wastewater and valuable materials, which it then sells to its clients.

9.      Mr. Valerio is TAV's chief executive officer and majority owner.

**TAV Engaged in a Bait-and-Switch Scheme.**

10.      TAV became an RSI customer in July 2020. It hired RSI to repair TAV's centrifuges manufactured by other companies and it leased RSI centrifuges.

11.      Initially, TAV timely paid RSI's invoices.

12.      As the companies continued to work together, TAV began ordering larger amounts of work from RSI.

13.      Additionally, Mr. Valerio traveled to Louisiana at least twice on his private jet to meet with RSI's chief executive, Ricky Cates, and discuss TAV's business relationship with RSI and ongoing work that TAV intended to provide RSI. Mr. Valerio represented to Mr. Cates that TAV was

expanding and would use RSI products with its new customers. Those representations were untrue.

14.    In early 2021, TAV and Mr. Valerio consistently represented to RSI that TAV would pay for the increased amount of work that TAV was requesting. For example, in early February, Mr. Valerio promised he was "working on payment on open invoices" for RSI.  At the same time, he told RSI to commence expensive repair work on TAV equipment at RSI Louisiana facilities.

15.    While RSI did that repair work, Mr. Valerio continued to make false promises of forthcoming payment. In early March 2021, Mr. Valerio promised to wire $242,012.11 in a conversation with RSI employee Sam Hafele. That wire was not sent.

16.    On March 8, 2021, in another conversation, Mr. Valerio promised Mr. Hafele that he would wire over two additional payments to RSI. But TAV did not make those payments.

17.    On March 16, 2021 Mr. Valerio promised Mr. Hafele, Mr. Cates, and Mr. Guidroz, RSI's Comptroller, via email that he would send multiple payments to RSI. TAV did not make those payments either.

18.    Mr. Valerio also had other telephone conversations with Mr. Cates in March and April 2021 in which he promised to make payments that never occurred.

19.    When Mr. Valerio made misrepresentations in phones calls and emails to Mr. Hafele, Mr. Hafele was located in Louisiana, upon information and belief. When Mr. Valerio made misrepresentations via email and phone call to Mr. Cates and Mr. Guidroz, the latter individuals were located in Louisiana.

20.    In addition to his false representations, Mr. Valerio caused TAV to make partial payments to RSI.  For example, on March 16, 2021, TAV paid RSI $45,000 in lease rent.

21.    RSI reasonably relied on Mr. Valerio's promises of payment, given TAV's past payment history and ongoing partial payments.

22.    Because RSI relied on Mr. Valerio's promises, it continued to perform work for TAV,

including leasing it RSI equipment and repairing TAV equipment sent to RSI Louisiana facility. In February, March, and April 2021, TAV incurred hundreds of thousands of dollars in repair and labor costs by RSI.

23.     But TAV had no intention of paying for the work it ordered. By late April 2021, TAV's scheme was clear and TAV had largely ceased paying RSI. When RSI demanded full payment before it did any further work, TAV and Mr. Valerio stopped responding to communications from RSI.

**TAV Breached its Leases with RSI**

24.     RSI leased centrifuges and other equipment to TAV under the following agreements:

   a. a Sept. 8, 2020 Equipment Lease Agreement, contract number Q-000891, between RSI and TAV for the lease of a 2 Phase 21-inch Centrifuge Skid (the "First Lease") (Ex. A-1);

   b. an Oct. 28, 2020 Equipment Lease Agreement, contract number Q-000924, for the lease of a 2 Phase 21-inch Centrifuge Skid (the "Second Lease") (Ex. A-3);

   c. a Jan. 21, 2021 Equipment Lease Agreement, contract number C-000941, for the lease of a 3 Phase 21-inch Centrifuge (the "Third Lease") (Ex. A-5); and

   d. a February 3, 2021 Equipment Lease Agreement, contract number Q-000958, for the lease of a Tecumesh 2 Phase 16-inch, Fully Variable, Centrifuge Package (the "Fourth Lease" (Ex. A-6) and, together with the First Lease, Second Lease, and Third Lease, the "Lease Agreements").

25.     The Lease Agreements provide set rental rates and maintenance costs.

26.     The Lease Agreements state that they are governed by Louisiana law.

27.     RSI performed under each of the Lease Agreement. It provided the equipment described in each Lease Agreement in good working condition to TAV. TAV has not complained about any defects in the leased equipment.

28.     The leased equipment benefitted TAV. TAV requested that RSI deliver the centrifuges from Louisiana to TAV's clients' locations throughout the United States. Specifically, TAV placed the centrifuge leased under the First Lease with a TAV client in Ohio. It placed the centrifuge leased under the Second Lease in TAV's own facility in Georgia. TAV placed the centrifuge leased under the Third

Lease with a TAV client in Florida. And TAV placed the centrifuge leased under the Fourth Lease with a TAV client in New Jersey. Once the leased equipment arrived at its location, TAV used the centrifuges to service its clients and generate revenue.

29.     RSI sent technicians to Ohio, Georgia, Florida, and New Jersey to conduct what RSI terms "field services," i.e. to repair and maintain the leased equipment and assist in its operation. Those field services included RSI technicians travelling from Louisiana, purchasing and installing parts, repairing the equipment, operating the leased equipment for TAV to generate saleable product for it, maintaining the equipment, and consulting with TAV on methods to improve performance of the equipment. TAV agreed to all the field service work.

30.     TAV employees and officers, including Mr. Valerio,  regularly communicated with RSI employees in Louisiana via email and phone about the RSI's field service work on the leased equipment. These communications generally occurred several times a week in January through April 2021.

31.     TAV has stopped paying for the leased equipment or the associated field services, breaching all the Lease Agreements. Despite this, it has refused to return any of the leased equipment. RSI has so far been able to repossess only the equipment leased under the Fourth Lease (although it may soon be able to repossess the equipment leased under the Third Lease).

32.     The Lease Agreements  § 3 require TAV to pay invoices submitted under those leases within 30 days.

33.      RSI has submitted invoices for $41,700 in rent and invoices for $39,399.41 in field services under the First Lease that TAV has not timely paid. Additionally, because TAV remains in ongoing possession of the equipment under the First Lease, it has recently incurred another $13,085 in rent and other charges that it will not pay, given its repudiation of its obligations under the Lease Agreements.

34.     RSI has submitted invoices for $56,250 in rent and invoices for $93,806.08 in field services under the Second Lease that TAV has not timely paid. Additionally, TAV has recently incurred another $22,500 in rent for its ongoing possession of the equipment under the Second Lease and RSI has submitted invoices for $72,506.59 in field services that are due in late May. TAV will not pay any of those charges, given its repudiation of its obligations under the Lease Agreements.

35.     RS has submitted invoices for $11,250 in rent under the Third Lease that TAV has not timely paid. Additionally, TAV has recently incurred another $27,363.89 in rent and other charges for its ongoing possession of the equipment under the Third Lease that TAV will not pay, given its repudiation of its obligations under the Lease Agreements.

36.     RSI has submitted invoices for $31,500 in rent under the Fourth Lease that TAV has not timely paid. Additionally, TAV has recently incurred another $20,295.83 in rent and other charges for its possession of the equipment under the Fourth Lease that TAV will not pay, given its repudiation of its obligations under the Lease Agreements.

37.     RSI notified TAV of its breaches under the Lease Agreements in numerous demands for payment and in attorney correspondence on April 27, May 3, and May 7, 2021 (see Ex.A-24-26). TAV did not cure those breaches within the required time.

38.     In sum, TAV owes RSI $429,656.80 in unpaid amounts under the Lease Agreements.

39.     Additionally, TAV has breached all the Lease Agreements by failing to timely return the leased equipment.

40.     The Lease Agreements require TAV to return the leased equipment to RSI. Specifically, the Lease Agreements § 7 provide that:

> If Lessee fails to perform or fulfill any obligation under this Agreement, Lessee shall be in default of this Agreement. Subject to any statute, ordinance, or law to the contrary, Lessee shall have seven (7) days from the date of notice of default by Lessor to cure the default. In the event Lessee, does not cure a default, Lessor may at Lessor's

option . . . declare Lessee in default of the Agreement. . . . *In the event of default, Lessor may, as permitted by law re-take possession of the Equipment.*

41.    The Lease Agreements § 8 also provide that:

At the expiration of the Lease Term, *Lessee shall surrender the Equipment to Lessor* by delivering the Equipment to Lessor or Lessor's agent in good condition and working order . . .

42.    The Lease Agreements § 15 further provide that:

The Equipment is and shall remain the exclusive property of Lessor. No title or right in said equipment shall pass to Lessee except the rights herein expressly granted. *On the termination of the Lease period . . . Lessee will immediately return said equipment to Lessor* in the condition it was received . . . .

43.    The Third Lease expired on February 11, 2021.

44.    When the Third Lease expired, TAV did not return the leased equipment to RSI.

45.    Additionally, on April 27, 2021, RSI requested TAV provide "adequate security" under La. Civil Code art. 2023 for the Third Lease. TAV failed to provide that security.

46.    Because of TAV's breaches, RSI later cancelled all the Lease Agreements and demanded return of all leased equipment in demand letters to TAV. TAV, though, failed to return any of the leased equipment, requiring RSI to negotiate separately with TAV's customers to regain some of its equipment.

47.    Indeed, RSI's centrifuges remain at TAV's location in Georgia and at TAV's customers' facilities in Ohio and Florida.

48.    TAV's failures to return the leased equipment has damaged RSI because it has been unable to re-lease the equipment to other customers.

49.    The Lease Agreements also provide for a 1.8% late fee on all unpaid amounts more than 30 days late.

50.    The Lease Agreements also provide that a prevailing party suing to enforce the lease is entitled to reasonable attorneys' fees, costs, and other expenses.

**TAV Failed to Pay RSI For Repairs to TAV's Equipment.**

51.     Since mid-2020, TAV has consistently sent TAV-owned equipment, such as centrifuges, to RSI for repair.

52.     As to each piece of equipment, the parties followed a similar pattern: TAV would send the equipment to RSI's Louisiana facility; RSI would provide a quote for anticipated repairs; TAV employees would then accept the quote verbally or in emails sent to RSI employees; and RSI would begin repairs. RSI would then invoice TAV for repairs that were completed. RSI's invoices included materials and cost of labor.

53.     TAV employees and executives regularly communicated with RSI employees in Louisiana via email and phone about the RSI's repair work on the TAV equipment, including the equipment that is the basis for this lawsuit. These communications generally occurred several times a week from November 2020 through April 2021.

54.     TAV, however, has failed to pay for RSI's repairs to several pieces of equipment: a Sharple-brand PM-75000 centrifuge ("Sharple Unit A"); two Sharple-brand XM706 centrifuges ("Sharple Unit B" and "Sharple Unit C"); and a GN-brand centrifuge (the "GN Unit").

55.     RSI has submitted unpaid invoices for its repairs to each piece of equipment to TAV in the following amounts:

   a.   RSI has invoiced TAV $114,710.55 for repairs to Sharple Unit A.

   b.   RSI has invoiced TAV $239,659.2 for repairs to Sharple Unit B.

   c.   RSI has invoiced TAV $174,389.94 for repairs to Sharple Unit C.

   d.   RSI has invoiced TAV $20,963.25 for repairs to the GN Unit.

56.     All of these invoices are overdue and TAV has not paid these invoices, totaling $542,722.94.

57.    RSI demanded payment of the overdue invoices in numerous business-to-business communications with TAV and in several demand letters from counsel. TAV has not responded.

## CLAIMS

### Count One: Request for Summary Proceeding for Surrender of Property per La. Rev. Stat. § 9:3322.

58.    Under the Louisiana Lease of Movables Act, La. Rev. Stat. § 9:3301 *et seq.*, a lessor of movables has the right to cancel a lease and recover possession of the leased property if certain conditions have been satisfied. *See* La. Rev. Stat. §§ 9:3318(A)(1)(b), 9:3320(A), 9:3321, 9:3322. The lessor may concurrently pursue its damages remedies for unpaid amounts under the leases. *See* La. Rev. Stat. §§ 3324-3325.

59.    RSI has satisfied all of the conditions set forth in La. Rev. Stat. § 9:3322.

60.    On May 13, RSI sent, by certified mail, a cancellation of the Lease Agreements to TAV at the address provided for in the Lease Agreements. *See* La. Rev. Stat. § 9:3320(A); Affidavit of Nick Guidroz ¶ 31 (Ex. A, A-26).

61.    TAV has not surrendered possession of at least two of the leased centrifuges within five days after the cancellation was mailed, as required by La. Rev. Stat. § 9:3321. *See* Affidavit of Nick Guidroz ¶ 32 (Ex. A).

62.    Since TAV has not timely surrendered possession of the leased centrifuges, then, under La. Rev. Stat. § 3322(A), "the lessor may cause the lessee to be cited summarily by a court of competent jurisdiction to show cause why he should not be ordered to surrender possession of the leased property to the lessor, in accordance with the provisions of this Section."

63.    Section 3322 requires the lessor provide an affidavit stating the "factual grounds on which the lessee's default is based" to "be accompanied by legible copies of the lease agreement, evidence of ownership of the leased movable, and documents or exhibits which show the mover's

right to possession of the leased movable."   La. Rev. Stat. § 9:3322B(3).  This affidavit and attached exhibits "shall be admissible and self-authenticating." *Id.* § 9:3322B(4).

64.    Additionally, the lessor must submit to the court "a certificate indicating the type of service made on the defendant and the date of service, and the original and not less than one copy of the proposed final judgment." *Id.* § 9:3322(C).

65.    Attached to this complaint is the required affidavit, *see* Affidavit of Nick Guidroz, Exhibit A, that provides evidence of the Lease Agreements, RSI's ownership of the leased centrifuges, and TAV's payment defaults and RSI's rights to the possession of the leased centrifuges.

66.    Additionally, RSI shall provide the required proof of service after service is effectuated and has attached the requisite copies of the proposed final judgment.

67.     Upon RSI's submission of this information, it respectfully requests the Court issue an order requiring TAV to "show cause why [it] should not be ordered to surrender possession of the leased property . . . ." *Id.* § 9:3322(A).

68.    RSI further requests the Court, after "try[ing] the rule [to show cause] and hear[ing] any defense that is made," *id.* § 9:3322(B)(1) to "render immediately a judgment ordering the lessee to surrender possession of the leased property to the lessor."  *Id.* § 9:3322(D).

69.    If TAV does not return the leased property within twenty-four hours after the order's rendition, "the clerk of the court that rendered the judgment shall issue, upon written request, a writ of possession directed to and commanding the sheriff, constable, or marshal of any parish where the movable property may be located to seize and deliver possession of the leased property to the lessor." *Id.* § 3322(E).

70.    RSI expressly reserves all its rights to seek damages, liquidated damages, late fees, and attorney's fees under the Lease Agreements and as permitted by law.

*Counts Two—Five: Breach of Contract (Lease Agreements) (against TAV)*

71.    Each of the Lease Agreements constitute valid and legally enforceable contracts between RSI and TAV.

72.    RSI performed its contractual obligations under the Lease Agreements.

73.    TAV breached all the Lease Agreements by, among other things, failing to pay its invoices when due.

74.    TAV additionally breached the Lease Agreements by failing to timely return the leased equipment and breached the Third Lease by failing to provide adequate security under La. Civil Code art. 202.

75.    TAV's breach of the Lease Agreements caused RSI injury in the amount of $429,656.80, as set forth herein, and in RSI's lost rental revenue due to its inability to obtain and re-lease its equipment.

76.    RSI additionally seeks the costs incurred in repossessing the leased equipment, in returning it to the condition in which it was originally provided to TAV, and its attorneys' fees incurred in prosecuting this suit, as the Lease Agreements allow.

77.    All conditions precedent to RSI's recovery under the Lease Agreements has occurred.

*Counts Six—Nine: Breach of Contract (against TAV) (Repairs to TAV Equipment)*

78.    For Sharple Unit A, RSI submitted a quote for repair work and TAV approved it. This constituted a valid and legally enforceable contract between RSI and TAV.

79.    RSI has performed under this contract by providing the quoted-for repair work.

80.    TAV has breached this contract by failing to pay $114,710 due to RSI.

81.    For Sharple Unit B, RSI submitted a quote for repair work and TAV approved it. This constituted a valid and legally enforceable contract between RSI and TAV.

82.    RSI has performed under this contract by providing the quoted-for repair work.

83.     TAV has breached this contract by failing to pay $239,523.21 due to RSI.

84.     For Sharple Unit C, RSI submitted a quote for repair work and TAV approved it. This constituted a valid and legally enforceable contract between RSI and TAV.

85.     RSI has performed under this contract by providing the quoted-for repair work.

86.     TAV has breached this contract by failing to pay $174,389.94 due to RSI.

87.     For the GN Unit, RSI submitted a quote for repair work and TAV approved it. This constituted a valid and legally enforceable contract between RSI and TAV.

88.     RSI has performed under this contract by providing the quoted-for repair work.

89.     TAV has breached this contract by failing to pay $20,963.25 due to RSI.

90.     All conditions precedent to RSI's recovery under the contracts described herein has occurred.

### Count Ten: Suit on Louisiana Open Account Statute (against TAV) (Repairs to TAV Equipment) (Alternative)

91.     In the alternative, RSI asserts a claim under La. Rev. Stat. § 9:2781, the Open Account Statute, for the work performed by RSI on TAV equipment.

92.     Through this lawsuit, RSI makes formal written demand for payment of the sum due for RSI's repair work on TAV-owned centrifuges.

93.     TAV has failed to pay RSI the full amount owed for RSI's repair work.

94.     Based on the foregoing, TAV owes RSI $549,722.94, in addition to attorneys' fees, legal expenses, court costs, and judicial interest in accordance with La. Rev. Stat. § 9:2781 *et seq.*

### Count Eleven: Detrimental Reliance (Alternative) (against TAV and Valerio)

95.     In the alternative, should any of the Lease Agreements or TAV-accepted repair quotes and acceptances not be deemed a contract, TAV is liable to RSI on the claim of Detrimental Reliance.

96.    TAV and Valerio represented to RSI that Valerio would pay the amounts owed under the Lease Agreements and for RSI's repairs to TAV's equipment.

97.    TAV and Valerio made those representations in word, by signing the Lease Agreements, by approving RSI's maintenance work on the leased centrifuges, and by approving the repair quotes for the TAV equipment via email or verbally. TAV also made its representations by its conduct, including accepting the leased RSI equipment, paying under the Lease Agreements, and requesting RSI maintenance of the leased equipment, and by delivering the TAV equipment to RSI for repair.

98.    RSI justifiably relied on TAV's representations that it would pay RSI. For several months in 2020, TAV made full payments to RSI for its work. TAV thereafter continued to make partial payments to RSI.

99.    RSI has suffered a detrimental change in its position because of its reliance on TAV. Specifically, RSI has lost rental income owed to it under the Lease Agreements, lost the ability to re-lease the rented centrifuges because TAV has refused to return them, and has lost labor and equipment costs incurred in repairing TAV's equipment and providing field services on the leased equipment.

### Count Twelve: Unjust Enrichment (Alternative) (against TAV)

100.    In the alternative, should any of the Lease Agreements or TAV-accepted repair quotes not be deemed a contract, TAV is liable to RSI on the claim of Unjust Enrichment.

101.    TAV has been enriched. RSI provided TAV with centrifuges and maintenance services on that equipment. RSI also repaired TAV equipment sent to RSI's facility.

102.    RSI has been impoverished. RSI has lost rental income owed to it under the Lease Agreements, lost the ability to re-lease the rented centrifuges because TAV has refused to return them, and has lost labor and equipment costs incurred in repairing TAV's equipment and providing field services on the leased equipment.

103.    There is a connection between the enrichment and resulting impoverishment. Namely, TAV has failed to provide RSI with the agreed-upon payment for its services.

104.    There is an absence of justification or cause for the enrichment and impoverishment.

### Count Thirteen: Conversion / Wrongful Seizure (TAV)

105.    Upon TAV's breach of the Lease Agreements, RSI had the right to immediate repossession of the of the leased equipment.

106.    RSI has demanded the return of the leased equipment but TAV has intentionally not returned it.

107.    TAV's ongoing possession of RSI's leased equipment constitutes conversion and wrongful seizure.

### Count Fourteen: Fraud (TAV and Valerio)

108.    TAV and Valerio misrepresented to RSI that TAV intended to pay RSI for the leased equipment, RSI's field services on that equipment, and for RSI's repairs to TAV's equipment.

109.    TAV and Valerio omitted in communications to RSI that TAV's true intent was to request significant amounts of work from RSI but not to pay for that work.

110.    TAV and Valerio intended to obtain an unjust advantage—RSI's provision of expensive industrial equipment and repairs to TAV—and to cause damage to RSI, namely, to cause it provide equipment and make repairs without payment.

111.    TAV and Valerio's misrepresentations and omissions related to a circumstance—TAV's willingness and ability to pay—that substantially influenced RSI's consent to provide equipment and repair services to TAV.

*Count Fifteen:  Negligent Misrepresentation (TAV and Valerio)*

112.    TAV and Valerio, in the course of their business or other matters in which they had a pecuniary interest, supplied false information, namely that TAV intended to pay RSI for the leased equipment, RSI's field services on that equipment, and for RSI's repairs to TAV's equipment.

113.    Additionally, TAV and Valerio omitted in communications to RSI that TAV's true intent was to request significant amounts of work from RSI but not to pay for that work.

114.    TAV and Valerio had a legal duty to supply correct information to RSI.

115.    TAV and Valerio breached their duties by affirmative misrepresentations and omissions.

116.    RSI suffered damages or pecuniary loss as a result of its justifiable reliance upon TAV and Valerio's omissions and affirmative misrepresentations.

### DAMAGES

117.    RSI seeks to recover its actual damages of $549,722.94 for unpaid repair and maintenance to TAV equipment and for unpaid amounts of $429,656.80 under the Lease Agreements, totaling $972,379.74.

118.    RSI further seeks to recover the late fees due the Lease Agreements, its damages incurred in repossessing and repairing the leased equipment, and its costs incurred in pursuing these claims, all of which are allowed under the Lease Agreements.

### PRAYER

119.    For these reasons, RSI requests the following:

a.  That TAV should be cited summarily to show cause why it should not be ordered to surrender possession of the leased centrifuges to RSI, and, after consideration of the evidence, that this Court render immediately a judgment ordering TAV to surrender possession of the leased property to RSI within 24 hours after rendition of the judgment, failing which the Clerk of Court will issue a writ of possession directed to and commanding the sheriff, constable, or marshal of the parish or county where the leased centrifuges are located to seize and deliver possession of the centrifuges to RSI;

b.  this Court entered judgment against TAV for RSI's actual damages, pre- and post-judgment interest, attorneys' fees, costs of court, and expenses; and

c.  that this Court award RSI all other relief to which it is entitled.

Respectfully submitted,

By: s/  Cearley W. Fontenot
    **Cearley W. Fontenot**, Bar #30502
    OATS & MARINO
    A Partnership of Professional Corporations
    100 East Vermilion Street, Suite 400
    Lafayette, LA 70501
    Tel:    337-233-1100
    Fax:    337-233-1178
    Email: cfontenot@oatsmarino.com

    **Robert W. Gifford** (*pro hac vice* application pending)
    Texas Bar No. 24093543
    rgifford@johnstonclem.com
    **Daniel S. Klein** (*pro hac vice* application pending)
    Texas Bar No. 24052277
    dklein@johnstonclem.com
    JOHNSTON CLEM GIFFORD PLLC
    1717 Main Street, Suite 3000
    Dallas, Texas 75201
    (214) 974-8000 Main
    (972) 474-1721 R. Gifford Direct

    *Attorneys for Rotating Solutions, Inc.*